# Case No. 25-20295

# In The United States Court of Appeals For the Fifth Circuit

---

Diana Loayza,

Plaintiff - Appellant

v.

Whole Foods Market Rocky Mountain/Southwest, L.P.,

Defendant – Appellee

---

**On Appeal from**

United States District Court for the Southern District of Texas

No. 4:23-CV-02658

---

**BRIEF OF APPELLANT DIANA LOAYZA**

---

SUBMITTED BY:

Ahad Khan
Texas Bar No. 24092624
712 Main Street, Suite 900
Houston, TX 77002
713-401-3558 – Telephone
ak@ahadkhanlaw.com - Email

## **CERTIFICATE OF INTERESTED PERSONS**

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of 5th Circuit Rule 28.2.1 have an interest in the outcome of this case.  These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

| Appellees: | Counsel for Appellees: |
|---|---|
| Whole Foods Market Rocky Mountain/Southwest, L.P. | Kelley Edwards of Littler Mendelson, P.C., Houston, Texas |
| Whole Foods Market Rocky Mountain/Southwest, L.P. | Jay Zhang of Littler Mendelson, P.C., Houston, Texas |

| Appellants: | Counsel for Appellants: |
|---|---|
| Diana Loayza | Ahad Khan of Ahad Khan Law PLLC, Houston, Texas |

/s/ Ahad Khan
Attorney of record for Appellant
Diana Loayza

## STATEMENT REGARDING ORAL ARGUMENT

Appellant respectfully requests oral argument in this case because Appellant wishes to allow the Court to satisfy its inquiries.  The analysis by the Court will aid lawyers, courts, and commentators in analyzing future employment cases under Title VII of the Civil Rights Act of 1964.  The briefs cannot substitute for the three-dimensional experience of oral argument, in allowing the litigants to explain their positions and allowing the Court to satisfy its inquiries.  To borrow from Socrates, communication must be tailored to the speaker and the listener, sown not in ink but in the soul, and only in oral communication is there clearness and perfection and seriousness.

# <u>TABLE OF CONTENTS</u>

CERTIFICATE OF INTERESTED PERSONS……………. ..................... ……….ii

STATEMENT REGARDING ORAL ARGUMENT…………….......... ……….iii

TABLE OF CONTENTS……………..................................................……….iv

TABLE OF AUTHORITIES……………........................................... ……….vii

JURISDICTIONAL STATEMENT…………….................................……….1

STATEMENT OF THE ISSUES……………....................................……….1

STATEMENT OF THE CASE…………….......................................……….2

     A. Loayza Secures Approval from a Supervisor to Make a Store Purchase at Cost Price for Her Baby Shower…………….....................................……….4

     B. Tupper Manipulates WFM's Investigation to Effectuate Loayza's Termination…………….........................................................……….6

SUMMARY OF THE ARGUMENT…………….................................……….11

ARGUMENT………….. .......................................................……….12

STANDARD OF REVIEW…………….......................................……….12

    I. The District Court Erred in Granting Summary Judgment When Loayza Presented Sufficient Evidence to Create a Genuine Issue of Material Fact as to Pretext …………….......................................................……….13

A. Legal Standards for Pregnancy Discrimination……………....………13

B. Legal Standards for Pretext………………...............................………15

C. *McDonnell Douglas* Is Atextual and Inconsistent with Title VII and Rule 56…………….........................................................................…18

D. Loayza Establishes Pretext………….. ...........................................22
   1. Loayza Had Advance Permission to Purchase the Baked Goods, Undermining WFM's Termination Rationale……………...............23

     a.  Loayza Complied with a Supervisor's Directive…………….....23

   2. Tupper Expressed Animus Toward Loayza's Pregnancy and Leave……………....................................................................………25

     a.  The District Court Applied the Wrong Test for Discriminatory Remarks…………….....................................................…26

     b.  Under the Correct Test, Tupper's Comments Show Pretext……………......................................................………27

   3. Tupper Manipulated the Investigation, Undermining its Integrity……………......................................................………29

   4. No Explanation Given for Tupper's Decision to Terminate Loayza Instead of Issuing a Final Warning……………...........................30

   5. Tupper and Others Regularly Engaged in the Same Conduct Without Discipline……………......................................................………31

II. The District Court Flipped the Summary Judgment Standard and Resolved Factual Disputes in WFM's Favor…………….........................................33

1. The District Court Credited WFM's Evidence While Qualifying Loayza's Evidence as "Alleged"……………. ................................…34

2. The District Court Resolved Factual Disputes in WFM's Favor...…36

III. The District Court Failed to Apply the Mixed-Motive Framework…………… ...........................................................…38

IV. This Case Is Appropriate for Trial…………… ...................................………40

CONCLUSION…………… .........................................................………42

CERTIFICATE OF SERVICE…………….....................................……………43

CERTIFICATE OF COMPLIANCE…………… ...............................………44

# <u>TABLE OF AUTHORITIES</u>

## CASES

*Allen v. USPS,* 64 F.4th 292 (5th Cir. 2023) ...........................................................17

*Ames v. Ohio Dep't of Youth Servs.*, 605 U.S. 303 (2025)....................18, 19, 20, 21

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ...............................19, 33, 37

*Assariathu v. Lone Star Health Mgmt. Assocs., L.P.*, 516 F. App'x 315 (5th Cir.

   2013) .........................................................................................................31, 32

*Black v. Pan Am. Labs.*, LLC, 646 F.3d 254 (5th Cir. 2011)....................14, 15, 38

*Brady v. Office of Sergeant at Arms*, 520 F.3d 490 (D.C. Cir. 2008) ...............20, 21

*Brown v. Wal-Mart Stores E., L.P.*, 969 F.3d 571 (5th Cir. 2020)..15, 17, 25, 32, 33

*Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222 (5th Cir. 2015) ...............30

*California Fed. Sav. & Loan Ass'n v. Guerra*, 479 U.S 272 (1987)......................13

*Campos v. Steves & Sons, Inc.*, 10 F.4th 515 (5th Cir. 2021)..............15, 17, 35, 36

*Chambers v. Sears Roebuck & Co.*, 428 F. App'x 400 (5th Cir. 2011)............17, 18

*Coleman v. Donahue*, 667 F.3d 835 (7th Cir. 2012)...............................................21

*Dabassi v. Motiva Enters.*, 107 F.4th 500 (5th Cir. 2024) ...............................12, 40

*Dediol v. Best Chevrolet, Inc.*, 655 F.3d 435 (5th Cir. 2011) .................................12

*Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003) ..................................................15

*Donaldson v. CDB Inc.*, 335 Fed. Appx. 494 (5th Cir. 2009)................................40

*EEOC v. Ryan's Pointe Houston.* No. 19-20656, 2022 U.S. App. LEXIS 27079

  (5th Cir. Sept. 27, 2022) (unpublished) ...............................................28

*EEOC v. WC&M Enters.*, 496 F.3d 393 (5th Cir. 2007)..........................12

*Fairchild v. Coryell Cnty.*, 40 F.4th 359 (5th Cir. 2022) ........................17

*Fitzpatrick v. Pontotoc Cty., Miss.*, 612 Fed. App'x. 770 (5th Cir. 2015)..............16

*Gee v. Principi*, 289 F.3d 342 (5th Cir. 2002)....................................15, 16

*Goudeau v. Nat'l Oilwell Varco, L.P.*, 793 F.3d 470 (5th Cir. 2015)...17, 26, 28, 31

*Haire v. Board of Sup'rs of La. State Univ. Agricultural & Mech. Coll.*, 719 F.3d

  356 (5th Cir. 2013).....................................................................15, 16, 23

*Hamilton v. Dallas County*, 79 F.4th 494 (5th Cir. 2023).......................18

*Harris v. FedEx Corp. Servs., Inc.*, 92 F.4th 286 (5th Cir. 2024)....................15, 18

*Heinsohn v. Carabin & Shaw, P.C.*, 832 F.3d 224 (5th Cir. 2016).16, 17, 23, 24, 41

*Laxton v. Gap Inc.*, 333 F.3d 572 (5th Cir. 2003). ....................................16, 25, 27

*McCoy v. City of Shreveport*, 492 F.3d 551 (5th Cir. 2007). ...................14

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).......13, 18, 19, 20, 21, 22

*Morris v. Town of Independence*, 827 F.3d 396 (5th Cir. 2016)............................14

*Muldrow v. City of St. Louis*, 601 U.S. 346 (2024) ................................18

*Nall v. BNSF Ry. Co.*, 917 F.3d 335 (5th Cir. 2019)...............................21

*Owens v. Circassia Pharm., Inc.*, 33 F.4th 814 (5th Cir. 2022)..........................37

*Poller v. Columbia Broadcasting Sys., Inc.*, 368 U.S. 464 (1962)..........................41

*Porter v. Houma Terrebonne Hous. Auth. Bd. of Comm'rs*, 810 F.3d 940 (5th Cir. 2015) ..................................................................................32, 33

*Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989) ...............................20

*Rachid v. Jack in the Box, Inc.*, 376 F.3d 305 (5th Cir. 2004) .........................14, 38

*Reed v. Neopost USA, Inc.*, 701 F.3d 434 (5th Cir. 2012).......................................26

*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000) .........14, 16, 37

*Salazar v. Lubbock Cnty. Hosp. Dist.*, 982 F.3d 386 (5th Cir. 2020) ..............16, 17

*Shackleford v. Deloitte & Touche, LLP*, 190 F.3d 398 (5th Cir. 1999) .................30

*Smith v. Xerox Corp.*, 371 Fed. App'x. 514 (5th Cir. 2010) ..................................38

*Squyres v. Heico Cos., L.L.C.*, 782 F.3d 224 (5th Cir. 2015).................................26

*St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993)............................................14

*Starnes v. Wallace*, 849 F.3d 627 (5th Cir. 2017) ...........................................40, 41

*Staten v. New Palace Casino, LLC*, 187 Fed. App'x 350 (5th Cir. 2006) ..............16

*Tolan v. Cotton*, 572 U.S. 650 (2014). ..................................................18, 33, 34, 40

*Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337 (5th Cir. 2007) ............12, 13

*Turner v. Kan. City S. Ry. Co.*, 675 F.3d 887 (5th Cir. 2012).........................30, 31

*Whittington v. Harris County, Tex.*, No. 24-20172, 2025 U.S. App. LEXIS 16585 (5th Cir. 2025) (unpublished) ..............................................................................18

*Willis v. Cleco Corp.*, 749 F.3d 314 (5th Cir. 2014) ..............................................14

*Young v. United Parcel Service*, 575 U.S. 206 (2015)............................................32

## STATUTES

28 U.S.C. § 1291. ................................................................................1

28 U.S.C. § 1331. ................................................................................1

42 U.S.C. § 2000e ...........................................................1, 13, 15, 19, 20

## RULES

Fed. R. Civ. P. 56 ...........................................................12, 18, 19, 20, 21

## JURISDICTIONAL STATEMENT

The district court properly exercised subject matter jurisdiction under 28 U.S.C. § 1331 and 42 U.S.C. § 2000e, et seq. This Court has jurisdiction under 28 U.S.C. § 1291. Final Judgment was entered on July 11, 2025. ROA.607. Appellant timely filed her notice of appeal on July 11, 2025. ROA.608. This appeal is from a final judgment that disposes of all claims. ROA.607.

## STATEMENT OF THE ISSUES

The issues to be ruled on by this Court are:

I.     Whether the district court erred in granting summary judgment when Loazya presented sufficient evidence to create a genuine dispute of material fact as to pretext.

II.    Whether the district court improperly applied the summary judgment standard when it credited the non-movant's evidence and resolved genuine disputes of material fact in the movant's favor.

III.   Whether the district court erred in failing to apply a mixed-motive analysis when a genuine dispute of material fact exists as to whether Loayza's pregnancy was a motivating factor in her termination.

**STATEMENT OF THE CASE**

In the fall of 2018, Loayza accepted a position as Bakery and Prepared Foods Team Leader at WFM's store in The Woodlands, Texas ("the store"), after working for the company at multiple locations beginning in 2014. ROA.392-400; ROA.461. Loayza worked at the store until her termination in September 2021. ROA.465.

On May 20, 2020, WFM placed Store Team Leader Kordell Woods ("Woods"), Loayza's supervisor, on administrative leave after he made inappropriate sexual advances toward her and created an uncomfortable work environment. ROA.400-01; ROA.403; ROA.473-74. One day later, Loayza called a regional supervisor to report that an irate Woods had lingered outside her home for about an hour before a family friend arrived and compelled him to leave. ROA.403-04; ROA.475. After initially lying about the visit, Woods's employment was terminated. ROA.403; ROA.477.

On August 20, 2020, Loayza began reporting to Woods's replacement, Brandon Tupper ("Tupper"), the new Store Team Leader. ROA.402-03; ROA.468. Because of the circumstances surrounding Woods's departure, Tupper actively maligned Loayza as a "troublemaker" in front of Assistant Store Team Leader Michele Sellars ("Sellars") and other employees. ROA.408; ROA.481. Tupper also had a habit of mocking Loayza's accent. ROA.406; ROA.408. WFM's human resources department intervened. ROA.407-08. Tupper "was not a fan of [Loayza]"

2

and voiced that sentiment to Sellars on multiple occasions, "including expressing his desire that he wanted [Loayza] gone." ROA.483. Independently, "several [employees] shared concerns about [Tupper's] approach" with Ashley Amiri, a WFM human resources employee. ROA.152; ROA.359.

Matters with Tupper only took a turn for the worse when Loayza learned she was pregnant on February 15, 2021. ROA.485. Less than a week later, Loayza was being treated at the emergency room for pregnancy complications. ROA.486. Tupper learned of Loayza's pregnancy at this time because she had to call in to inform WFM that her doctor ordered her to take the week off. ROA.442-43. On April 19, 2021, Loayza was approved for intermittent leave under the Family and Medical Leave Act ("FMLA") from April 5, 2021, through October 24, 2021. ROA.488. In one instance, Tupper threatened to give Loayza disciplinary points for leaving work early, even though she explained to him that her sickness was caused by her pregnancy. ROA.439-41.

Loayza informed Tupper that she intended to take a maternity leave of at least four months. ROA.439; ROA.492. Tupper expressed unhappiness with the anticipated length of Loayza's maternity leave, comparing it to the maternity leave of another employee at the store, which was only four weeks. ROA.436-37; ROA.492. This was even though Loayza was planning to work up until shortly before her October due date. ROA.437-38; ROA.547.

3

Shortly after this conversation, Tupper made plans to bring in a new Assistant Bakery Team Leader to absorb Loayza's job duties. On August 13, 2021, Allegra Aviles ("Aviles") submitted a candidate assessment for the position. ROA.494. Loayza, who was out on COVID-19 quarantine at the time, returned to work to find she had a new subordinate in Aviles. ROA.438. Tupper circumvented WFM's policies in hastily hiring Aviles without including bakery department employees in the interview process. ROA.452-54. This hasty hiring would not have occurred had Loayza not been pregnant and about to start maternity leave. ROA.452-53. Tupper expressed the importance to Loayza that she train Aviles on all aspects of her job in the final weeks before her scheduled leave. ROA.437; ROA.456; ROA.492.

### A. Loayza Secures Approval from a Supervisor to Make a Store Purchase at Below Retail Price for Her Baby Shower

In August 2021, with her due date just two months away, Loayza made plans to purchase baked goods from the store's bakery for her baby shower. ROA.410-11; ROA.437-38. Loayza stopped by the store leadership office to ask Sellars if she could buy baked goods at cost price, which Loayza understood to be the price that WFM pays to its vendors. ROA.410-11; ROA.413. Sellars was the proper person to ask because she was the bakery point person after Tupper's reorganization of the store's departments. ROA.405. Loayza previously made two purchases at cost price while working for WFM in another region. ROA.426. Sellars "gave [Loayza] full permission to purchase baked goods at cost price for her baby shower." ROA.483.

4

Had Sellars denied Loayza permission to make the purchase at cost price, Loayza would not have done so.  ROA.434.

There is also no evidence Sellars was trying to give Loayza preferential treatment.  According to Sellars, "[Loayza] was not trying to engage in any subterfuge" and she "was not friends with [Loayza]" and was not "trying to help her out."  ROA.483.

On August 20, 2021, Loayza placed her order for the baby shower with Bona in writing.  ROA.411-12; ROA.515-16.  On August 31, 2021, before Loayza made the cost price purchase of the baked goods, Sellars resigned her job with WFM.  ROA.435; ROA.479-80.  Sellars made the decision because "it was in the best interest of [her] mental health to no longer work with Brandon Tupper."  ROA.480.  Sellars "found [Tupper] to be inconsistent, negative, impulsive, unethical, and lacking in personal integrity."  ROA.480.  That Tupper did not a have a good relationship with Sellars is consistent with Loayza's observation that Tupper "was [a] very unrespectful [sic] person, especially with girls."  ROA.409.

On September 3, 2021, Loayza completed the order and went to the store to pay for it.  ROA.519.  Bona created the purchase label and used a computer system for vendor pricing to determine the amount Loayza should pay at cost price.  ROA.412-14.  This was the same system Bona used to place the order with WFM's vendors.  ROA.415.  To ring up items at cost price, Bona created a label using the

price look-up system to manually enter the cost price of all items being purchased. ROA.416-17. Bona matched the price he charged Loayza with the total cost price of all the baked goods collectively. ROA.420-21; ROA.522. Loayza asked to pay for items at cost price—not below cost price—and did not direct Bona to create an inaccurate label. ROA.422-23.

It was thus Bona, not Loayza, who ultimately determined the price that Loayza wound up paying. ROA.417. Loayza had no reason to doubt that she was paying the correct price based on the label she received from Bona. ROA.422-23. Loayza's conviction that she had done nothing wrong is underscored by the fact that she herself shared pictures of her baby shower with Tupper, who immediately recognized that the baked goods originated from WFM's bakery. ROA.526-27; ROA.531.

After taking the label to the register, Loayza then had her purchase rung up by another store employee, who asked Loayza for her employee discount card that provides a discount on store purchases. ROA.418; ROA.427. Loayza reflexively provided her employee discount card, paid the final price, and left the store. ROA.419-20. In total, Loayza paid $158.25 for the baked goods. ROA.533.

## B. Tupper Manipulates WFM's Investigation to Effectuate Loayza's Termination

Loayza heard nothing about her cost price transaction until mid-September 2021, when she was called into a meeting with Tupper and Latisha Palmer

("Palmer"), a human resources representative.  ROA.424.  During the meeting, Tupper ignored Loayza's explanation that Sellars gave her permission to make the purchase at cost price and demanded that Loayza write up a statement that he would influence.  ROA.425; ROA.427-28; ROA.492.

Loayza initially wrote, "I understood that we have a policy that we need to pay for everything that we get at the store."  ROA.428.  After reviewing and finding the statement unsatisfactory, Tupper ordered Loayza to make changes, including altering the meaning of that sentence by adding the word "retail" so it now read "I understood that we have a policy that we need to pay *retail* for everything that we get at the store."  ROA.427-28; ROA.492 (emphasis added).  The incongruous addition of the word "retail" is apparent on the third line of the second page of Loayza's hand-written statement, squeezed in after the fact.  *See* ROA.536. Tellingly, Palmer was not present when Tupper instructed Loayza to alter her statement.  ROA.431.

Hours later, Loayza corrected the record with a statement explaining everything to Palmer, including Tupper's coercion.  ROA.518-20; ROA.551. Loayza firmly denied intentional wrongdoing.  ROA.519. ("I did what I thought was right … [and] would not intentionally do anything to jeopardize a career I take pride in…").

After the meeting, Loayza called Sellars to inform her that WFM launched an investigation over the purchase that Sellars approved. ROA.389-90. Sellars in turn sent an email to Aaron Villalobos ("Villalobos"), a human resources representative, on September 16, 2021, informing him that she gave permission to Loayza to purchase baked goods "at cost for her Baby Shower." ROA.538. Sellars also provided her contact information to WFM to answer "further questions about this interaction." ROA.538. A day later, Sellars sent another email to Villalobos, "fearing [Loayza] was going to be terminated over something I approved." ROA.479. WFM never responded to or interviewed Sellars, despite receiving this information that was highly relevant to its ongoing investigation of the matter. ROA.509-10.

On September 25, 2021, Tupper informed Loayza that WFM had terminated her employment and handed her termination paperwork. ROA.433; ROA.540. Loayza's termination occurred just nine days before she was set to go on maternity leave, which put her in a difficult position because her health insurance expired at the end of September, just before she was due to give birth. ROA.458-59; ROA.547. Loayza never received a corrective action prior to her termination. ROA.319-20. This is the only time in her life that Loayza has ever been terminated from a job. ROA.388.

WFM severely underemphasizes Tupper's role in the decision to terminate Loayza; however, the facts tell a different story.  In interrogatory answers, WFM cited a host of human resources employees, including Leslie Mattingly ("Mattingly"), as individuals involved in the decision-making process to terminate Loayza.  ROA.507-08.  Tupper, meanwhile, is merely alluded to in the bland and cryptic reference to a "consultation with location-specific management personnel." ROA.507-08.

However, it was Tupper who signed Loayza's termination form and communicated the decision to her.    ROA.433; ROA.540.   In addition, contemporaneous communications make it clear that it was indeed Tupper who decided on the severity of Loayza's punishment.  While Mattingly is noncommittal on the appropriate form of discipline: ("I am okay with separating her. If [Tupper] wants to do a final [warning] I am okay with that too."), Villalobos follows up by noting that Tupper "supports separation."  ROA.550.

Sellars's reaction to learning of the termination sums it up: "I was very surprised to learn that Diana [Loayza] was fired for the reason she was, but I was not surprised that Brandon [Tupper] was involved."  ROA.483.

Tupper's choice to terminate Loayza was not only decisive but also indicative of hypocrisy.  In correspondence submitted to WFM during its investigation, Sellars observed that Tupper was inconsistent in what he allowed team members to do, and

displayed preferential treatment by allowing some employees to take items home from the store, such as a gas cooker, tables, and chairs. ROA.480. Tupper gave these items away for free, "especially [to] his favorite team leaders." ROA.446-47. WFM has denied that Tupper had the authority to gift such merchandise and property to employees free of charge. ROA.545. Yet, Tupper was not terminated in light of these revelations, while Loayza was. ROA.507; ROA.540.

In addition, Tupper himself routinely flouted the WFM theft policy by asking his subordinate team leaders to provide free items for at least five store celebrations that included birthdays and baby showers. ROA.448-49. Each team leader was expected to bring a food item from their department for these events that would be scanned as spoiled after it was consumed. ROA.448-49. Around the time of Loayza's termination, Tupper expected her to bring a cake falsely marked "spoiled" to the baby shower hosted at the store for the wife of Assistant Store Leam Leader Louis Alvarez. ROA.450. No purchase price was paid to WFM for these items as they were scanned as "spoiled." ROA.448. Yet, no one other than Loayza was ever disciplined for this regular practice. ROA.455-56. Ultimately, WFM terminated Loayza for a disputed violation just two weeks before she gave birth and nine days before she was set to start her maternity leave. ROA.382; ROA.547.

WFM moved for summary judgment and the district court granted the motion on the basis that Loayza "failed to meet her burden to establish pretext with respect

10

to her discrimination claim." ROA.606. Loayza now appeals the district court's final judgment. ROA.607-08.

## <u>SUMMARY OF THE ARGUMENT</u>

Loayza's employment was terminated mere days before she was set to start her maternity leave, by a discriminatory supervisor who had already expressed frustration about the length of her leave and wanted her gone. Loayza filed the underlying pregnancy discrimination case against WFM, her former employer.

The district court erred in granting summary judgment on the basis of pretext because genuine issues of material fact exist such that a reasonable juror can conclude that Loayza's pregnancy motivated her termination, and her discharge for a supervisor-approved purchase of bakery goods for her baby shower was a pretext.

The district court did not credit evidence in the light most favorable to Loayza, the non-movant, and resolved genuine disputes of material fact in favor of WFM. A reasonable juror could find that Loayza's baked goods purchase was supervisor-approved and thus did not constitute intentional theft. Further, evidence of the decisionmaker's negative attitude toward Loayza's pregnancy, interference in WFM's investigation of Loayza, and his own flouting of this policy could allow a reasonable juror to find in Loayza's favor. As such, a fact issue exists as to pretext, precluding summary judgment.

11

The district court additionally erred in failing to analyze Loayza's claims under a mixed-motive analysis. Loayza presented sufficient evidence to create a genuine dispute of material fact as to whether WFM impermissibly considered her pregnancy and related leave as a motivating factor in its decision to terminate her.

The grant of summary judgment should be reversed.

## ARGUMENT

## STANDARD OF REVIEW

This Court reviews a district court's grant of summary judgment de novo. *Dabassi v. Motiva Enters.*, 107 F.4th 500, 505 (5th Cir. 2024). A party is entitled to summary judgment only if the pleadings, depositions, interrogatory answers, admissions, and affidavits on file "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists when the record, taken as a whole, could lead a rational trier of fact to find for the non-moving party. *Dediol v. Best Chevrolet, Inc.*, 655 F.3d 435, 439 (5th Cir. 2011).

On a motion for summary judgment, the district court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in its favor. *See EEOC v. WC&M Enters.*, 496 F.3d 393, 397 (5th Cir. 2007). Courts must therefore "refrain from making credibility determinations or weighing the

evidence." *Id.* (quoting *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343

(5th Cir. 2007).

### I.    The District Court Erred in Granting Summary Judgment When Loayza Presented Sufficient Evidence to Create a Genuine Issue of Material Fact as to Pretext

### A.    Legal Standards for Pregnancy Discrimination

Title VII of the Civil Rights Act of 1964 prohibits discrimination with respect

to the terms, conditions, or privileges of employment.  42 U.S.C. § 2000e-2(a).  In

1978, the Pregnancy Discrimination Act amended Title VII to include discrimination

"on the basis of pregnancy, childbirth, or related medical conditions" within the

composition of unlawful sex discrimination.  42 U.S.C. § 2000e-(k).

As observed by the Supreme Court, "the entire thrust" behind the amendment

was "to guarantee women the basic right to participate fully and equally in the

workplace, without denying them the fundamental right to full participation in

family life." *California Fed. Sav. & Loan Ass'n v. Guerra*, 479 U.S 272, 289 (1987)

(internal quotations omitted).

Because discriminatory intent is rarely overt, a plaintiff may present a case

based on circumstantial evidence under the *McDonnell Douglas* burden-shifting

framework.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973).

Under this framework, the plaintiff may make a prima facie case of discrimination

by showing that she: "(1) is a member of a protected group; (2) was qualified for the

13

position at issue; (3) was discharged or suffered some adverse employment action by the employer; and (4) was replaced by someone outside [her] protected group or was treated less favorably than other similarly situated employees outside the protected group." *Morris v. Town of Independence*, 827 F.3d 396, 400 (5th Cir. 2016) (quoting *Willis v. Cleco Corp.*, 749 F.3d 314, 319-20 (5th Cir. 2014)).

After the plaintiff establishes a prima facie case, "the burden then shifts to the employer to provide a legitimate, nondiscriminatory or nonretaliatory reason for its employment action." *McCoy v. City of Shreveport*, 492 F.3d 551, 557 (5th Cir. 2007). Once the employer has proffered a legitimate, non-discriminatory reason, the question of whether the employee actually made a prima facie case is "no longer relevant" and thus "disappears" and "drops out of the picture." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510-11 (1993); *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000).

After the employer does so, the burden then shifts back to the plaintiff to show either: "(1) that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another 'motivating factor' is the plaintiff's protected characteristic (mixed-motive[s] alternative)." *Black v. Pan Am. Lab., LLC*, 646 F.3d 254, 259 (5th Cir. 2011) (quoting *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004)) (alteration in original).

14

**B.    Legal Standards for Pretext**

In the final stage of the burden-shifting scheme, the employee may show either (1) that the employer's reason is not true or (2) that the employer's reason, while true, is only one of the reasons for its conduct, and another motivating factor is the plaintiff's pregnancy.  *Black*, 646 F.3d at 259.  Because Title VII prohibits "any employment practice" motivated even in part by sex (including pregnancy as of the 1978 amendment), an employee may still establish liability "even though other factors also motivated the practice."  42 U.S.C. § 2000e-2(m); *Campos v. Steves & Sons, Inc.*, 10 F.4th 515, 529 n.4 (5th Cir. 2021); *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 92 (2003).

"Pretext can be proven by *any* evidence that casts doubt on the credence of the employer's proffered justification for the adverse employment action."  *Brown v. Wal-Mart Stores E., L.P.*, 969 F.3d 571, 578 (5th Cir. 2020) (emphasis added); *Harris v. FedEx Corp. Servs., Inc.*, 92 F.4th 286, 297 (5th Cir. 2024).  Summary judgment is "inappropriate" where the employee "has provided sufficient evidence to cast doubt on [the employer's] explanation" for its challenged employment action. *Gee v. Principi*, 289 F.3d 342, 348 (5th Cir. 2002).

The fact that the employer's reason is false or unworthy of credence gives rise to an inference of pretext.  *Haire v. Board of Sup'rs of La. State Univ. Agricultural & Mech. Coll.*, 719 F.3d 356, 365 n.10 (5th Cir. 2013) (reversing grant of summary

judgment and holding that "[e]vidence demonstrating that the employer's explanation is false or unworthy of credence. . . is likely to support an inference of discrimination *even without further evidence of defendant's true motive*.") (italics in original); *Fitzpatrick v. Pontotoc Cty., Miss.*, 612 Fed. App'x. 770, 774 (5th Cir. 2015).

An employee's prima facie case "combined with sufficient evidence to find that the employer's asserted justification for its action was false, may permit the trier of fact to conclude that the employer unlawfully discriminated" without the plaintiff introducing additional and independent evidence of discrimination. *Reeves*, 530 U.S. at 148-49. Thus, "[a] prima facie case and sufficient evidence to reject the employer's explanation may permit a finding of liability." *Id.* at 149; *Laxton v. Gap, Inc.*, 333 F.3d 572, 578 (5th Cir. 2003); *Staten v. New Palace Casino, LLC*, 187 Fed. Appx. 350, 358-359 (5th Cir. 2006); *Gee*, 289 F.3d at 348. The Supreme Court has developed this formula because "there will seldom be eyewitness testimony to the employer's mental processes." *Reeves*, 530 U.S. at 141 (internal quotations omitted).

A "genuine issue of material fact" as to the veracity of the employer's reason for termination "precludes summary judgment." *Heinsohn v. Carabin & Shaw, P.C.*, 832 F.3d 224, 237 (5th Cir. 2016); *Fitzpatrick*, 612 Fed. Appx. at 774; *Salazar v. Lubbock Cnty. Hosp. Dist.*, 982 F.3d 386, 389 (5th Cir. 2020) (holding an employee

can meet its burden by showing "that reasonable minds could disagree about whether these were, indeed, the reasons for her discharge.").

In addition to showing that the employer's proffered explanation is false or unworthy of credence, a plaintiff may also show pretext through evidence of disparate treatment. *Allen v. USPS*, 63 F.4th 292, 301 (5th Cir. 2023) (internal quotations and citations omitted); *Brown*, 969 F.3d at 580 (noting pretext can be shown by demonstrating that similarly situated employees were treated more favorably).

The lens through which the evidence is viewed must always be in the light favorable to the party opposing summary judgment. *Fairchild v. Coryell Cnty.*, 40 F.4th 359, 363 (5th Cir. 2022) ("As is always true at summary judgment, the facts must be viewed in favor of the nonmovant."). As this Court has put it, "we will view the events in this case through the non-movant employee's relevant evidence, even if disputed, and the employer's undisputed evidence." *Campos*, 10 F.4th at 518.

In determining whether an employer's reason for termination is legitimate or pretextual, "a finder of fact must weigh the evidence." *Heinsohn*, 832 F.3d at 245. A court who weighs the evidence and resolves disputed issues in favor of the moving party does so improperly. *Id.*; *Goudeau v. Nat'l Oilwell Varco, L.P.*, 793 F.3d 470, 474 (5th Cir. 2015). Instead, a court "must disregard all evidence favorable to the moving party that the [finder of fact] is not *required* to believe. *Chambers v. Sears*

17

*Roebuck & Co.*, 428 F. App'x 400, 407 (5th Cir. 2011) (emphasis added). At the summary judgment stage, a court "may make no credibility determinations." *Id.*

Accordingly, "courts must take care not to define a case's 'context' in a manner that imports genuinely disputed factual propositions." *Tolan v. Cotton*, 572 U.S. 650, 657 (2014). "We would necessarily wade into making credibility determinations, weighing the evidence, and drawing inferences. This we cannot do." *Harris*, 92 F.4th at 298. A reasonable juror can find for the employee even in the face of "substantial evidence" of "poor performance." *Id.*

Summary judgment is inappropriate when "evidence cuts the other way and suggests a rational jury could find the [employer's] story is pretextual." *Whittington v. Harris County, Tex.*, No. 24-20172, 2025 U.S. App. LEXIS 16585, at *10 (5th Cir. 2025) (reversing summary judgment on employment discrimination, retaliation, and hostile work environment claims).

### C.    *McDonnell Douglas* **Is Atextual and Inconsistent with Title VII and Rule 56**

Both this Court and the United States Supreme Court have recently purged atextual doctrines from Title VII case law. *See Hamilton v. Dallas County*, 79 F.4th 494, 497 (5th Cir. 2023) (removing the requirement of an ultimate employment action); *Muldrow v. City of St. Louis*, 601 U.S. 346, 360, (2024) (removing the requirement of showing significant harm); *Ames v. Ohio Dep't of Youth Servs.*, 605 U.S. 303, 309 (2025) (removing the background circumstances rule requiring

members of a majority group to satisfy a heightened evidentiary standard). "Judge-made doctrines have a tendency to distort the underlying statutory text, impose unnecessary burdens on litigants, and cause confusion for courts." *Ames*, 605 U.S. at 313 (Thomas, J., concurring).

The *McDonnell Douglas* framework has no basis in the text of Title VII. *See* § 42 U.S.C. 2000e-2(a)(1). Nor does it have any basis in any other law. *Ames*, 605 U.S. at 320 (Thomas, J., concurring). It is entirely judge-made. *Id.* It should be the next atextual doctrine to go. *See Id.* at 322 (*McDonnell Douglas* "is incompatible with the summary-judgment standard" and "fails to encompass the various ways in which a plaintiff could prove his claim").

*McDonnell Douglas* was originally developed for courts to use in a bench trial. *Id.* at 319. There, it may continue to be appropriate. But summary judgment is not a bench trial—the role of factfinder is reserved for the jury. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A plaintiff need not prove any elements at summary judgment; instead, the plaintiff need only point to sufficient evidence to create a "genuine dispute as to" the ultimate issue of discrimination. *Ames*, 605 U.S. at 323 (Thomas, J., concurring).

The *McDonnell Douglas* framework is incompatible with summary judgment standards. Rule 56 requires a court to grant summary judgment when *the movant* establishes there is "no genuine dispute as to any material fact…" F. R. Civ. P.

19

56(a). The framework flips that standard by requiring the non-movant plaintiff to produce evidence showing pretext. But "a plaintiff need not establish or prove any elements—by a preponderance [of the evidence] or otherwise—to survive summary judgment." *Ames*, 605 U.S. at 322 (Thomas, J., concurring) (internal citation omitted). Therefore, at the third and final stage of the *McDonnell Douglas* framework, the proper standard should be whether the plaintiff can "present sufficient evidence to create a 'genuine dispute as to' whether the employer's stated reason was pretextual." *Id.* at 323 (quoting F. R. Civ. P. 56(a)).

Furthermore, Title VII provides that an unlawful employment practice is established when the complainant demonstrates that a protected characteristic "was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m). The *McDonnell Douglas* standard heightens the employee's burden of proof to show that the employer's rationale was *wholly* pretextual instead of allowing for a true mixed motive analysis where the employer's articulated reason was *part* of the reason for the employer's action and the employee's protected characteristic was another *part* of the reason. *See Ames*, 605 U.S. at 323-24 (Thomas, J., concurring); *Price Waterhouse v. Hopkins*, 490 U.S. 228, 258 (1989).

Finally, the *McDonnell Douglas* framework is confusing, clunky, and can lead to unjust outcomes. *Ames*, 605 U.S. at 319 (Thomas, J., concurring) (*McDonnell*

*Douglas* in "the summary judgment context has caused 'significant confusion' and 'troubling outcomes on the ground'"); *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 493-94 (D.C. Cir. 2008) (Kavanaugh, J.) (*McDonnell Douglas* "has not benefited employees or employers; nor has it simplified or expedited court proceedings. In fact, it has done exactly the opposite, spawning enormous confusion and wasting litigant and judicial resources."); *Coleman v. Donahue*, 667 F.3d 835, 862-63 (7th Cir. 2012) (Wood, J., concurring) (*McDonnell Douglas* "was designed to clarify and to simplify the plaintiff's task in presenting such a case. Over the years, unfortunately, both of those goals have gone by the wayside."); *Nall v. BNSF Ry. Co.*, 917 F.3d 335, 351 (5th Cir. 2019) (Costa, J., concurring) (noting that *McDonnell Douglas* is a "judge-created doctrine" that "has been widely criticized for its inefficiency and unfairness even in the space it is supposed to occupy…").

As the trend of purging atextual judge-made doctrines from Title VII cases continues, *McDonnell Douglas's* days are likely numbered. Loayza invites this Court to set aside the *McDonnell Douglas* standard and instead analyze this case through the appropriate textual lens of Title VII and Rule 56; that is, whether the evidence in its totality raises a genuine issue of material fact about whether Loayza's pregnancy motivated her termination. Doing so does not violate Supreme Court precedent. *Ames*, 605 U.S. at 326 (Thomas, J., concurring) ("This Court has never required anyone to use it").

21

### D.  Loayza Establishes Pretext

The district court granted summary judgment solely on the issue of pretext. ROA.605-06. ("[T]he Court finds that [Loayza] has failed to meet her burden under the *McDonnell Douglas* framework to show that Defendant's stated reasons for her termination are pretext for pregnancy discrimination.").  However, the record contains a variety of evidence and facts that, if viewed in the light most favorable to Loayza, could lead a rational juror to find pretext.  This includes:

- Contemporaneous documentation and an affidavit from Loayza's supervisor showing that she had permission to purchase the baked goods below retail price.  ROA.483, ROA.538.

- Testimony that Tupper, the decisionmaker, reacted negatively to Loayza's pregnancy announcement, threatened to retaliate against her for her exercise of maternity leave, and broke protocol to hire her permanent replacement.  ROA.436-37; ROA.452-54; ROA.492.

- Undisputed testimony and contemporaneous documentation showing that Tupper manipulated the disciplinary investigation by forcing Loayza to alter her statement.  ROA.427-28; ROA.492.

- An absence of contemporaneous documentation indicating any reason why Tupper, when presented by HR with the option of giving Loayza a final warning, instead opted to terminate Loayza's employment. ROA.550.

- Undisputed testimony that Tupper himself, in addition to several other employees, regularly flouted the same policies relied on by WFM to justify Loayza's termination.  ROA.446-50; ROA.480.

Both standing alone and as a whole, these facts create triable issues for a jury.

Each point is discussed in turn below.

### 1. Loayza Had Advance Permission to Purchase the Baked Goods, Undermining WFM's Termination Rationale

WFM's articulated basis for Loayza's termination is her "intentional ringing up of incorrect prices" based on her "aware[ness] that her purchase did not align with policy." ROA.540. However, this rationale is directly contradicted by contemporaneous documentation and an affidavit from her supervisor, showing the purchase was approved and that Loayza lacked the requisite intent for the violation.

#### a. Loayza Complied with a Supervisor's Directive

This Court has determined that evidence that an employee has "complied with her superior's directives" creates a genuine issue of material fact as to whether the employee has "committed any official wrongdoing." *Haire*, 719 F.3d at 365; *see also Heinsohn*, 832 F.3d at 239.

In *Heinsohn*, another pregnancy discrimination case, this Court determined that evidence showing an employee was terminated after following a supervisor's instructions suggests the termination "might have been improper." *Heinsohn*, 832 F.3d at 239. This created a genuine issue of material fact as to whether the employee committed any wrongdoing, and summary judgment was reversed. *Id.* (citing *Haire*, 719 F.3d at 365).

Here, Loayza followed the directions of her supervisor, just as the employee in *Heinsohn*. Sellars, who was Loayza's supervisor and bakery "point," gave her "full permission" to purchase the baked goods at the discounted rate. ROA.405;

ROA.483.  Following Sellars's instructions, Loayza made no effort to conceal or hide the transaction.  Like the defendant in *Heinsohn*, WFM terminated Loayza for alleged violations stemming from this directive.  ROA.540.  Sellars, upon discovering that Loayza was being investigated for following her directive, sent an email to WFM clarifying that she gave Loayza permission to conduct the transaction at issue:

-------- Original message --------
From: Michele Sellars ████████████████
Date: 9/16/21 7:15 PM (GMT-06:00)
To: Aaron.Villalobos ████████████
Subject: Diana Loyaza, The Woodlands

This is Michele Sellars, former ASTL at 10574 The Woodlands.  I told Diana Loyaza that she could purchase some Sweet Bites at cost for her Baby Shower.  My understanding was that this was allowed for some Team Members on special occasions in the California market.  Of course I thought I would be there to make sure the purchase happened properly.  If anyone has further questions about this interaction they may reach out to me at ████████

Sincerely,
Michele Sellars

ROA.538.

In receiving this email during the investigation, WFM had confirmation that Loayza received prior approval and, as such, lacked the requisite intent for the

alleged violations.  Despite ample evidence that Loayza lacked any intent for an "intentional theft" violation, Tupper proceeded with termination.

The trial court failed to credit this evidence, stating "[t]he issue at the pretext stage is whether [Defendant's] reason, even if incorrect, was the real reason for [Plaintiff's] termination." ROA.604 (internal citation omitted).  However, this Court has determined that evidence "challenging the substance of violations" casts doubt on an employer's proffered justification. *Laxton v. Gap Inc.*, 333 F.3d at 580.  Such is the case here.

Loayza challenged the substance of the violations by showing that WFM had contemporaneous notice that she (1) complied with a supervisor's directive; and (2) lacked the requisite intent for the alleged violation.  Despite this, WFM proceeded with her termination, without explanation.  Because this evidence casts doubt on WFM's proffered justification, a rational juror could find it unworthy of credence. *Brown*, 969 F.3d at 578 ("Pretext can be proven by *any* evidence that casts doubt on the credence of the employer's proffered justification for the adverse employment action.") (emphasis added).  As such, the district court erred in granting summary judgment.

## 2.  Tupper Expressed Animus Toward Loayza's Pregnancy and Leave

The district court erred by applying the wrong test for discriminatory remarks. In doing so, it failed to properly account for evidence that Tupper, the

decisionmaker, expressed frustration and threatened discipline against Loayza for her pregnancy and resultant leave.

### a. The District Court Applied the Wrong Test for Discriminatory Remarks

Loayza presented evidence that Tupper, the decisionmaker, made discriminatory remarks toward her based on her pregnancy and related leave. ROA.436-37; ROA.440; ROA.492. However, in reviewing this evidence, the district court erred by applying the four-part stray remarks test for direct evidence, which is inapplicable here. ROA.605; s*ee Goudeau*, 793 F.3d at 475-76. In *Goudeau,* this Court determined that the four-part test applied by the district court applies "only when the remarks are being used as direct evidence of discrimination." *Id.* at 475 (citing *Reed v. Neopost USA, Inc.*, 701 F.3d 434, 441 (5th Cir. 2012)).

In a circumstantial case like this one, "in which the discriminatory remarks are just one ingredient in the overall evidentiary mix" courts "consider the remarks under a more flexible standard." *Id.* (internal quotations omitted). The more flexible standard is whether the comments show "(1) discriminatory animus (2) on the part of a person that is either primarily responsible for the challenged employment action or by a person with influence or leverage over the relevant decisionmaker." *Goudeau*, 793 F.3d at 475-76 (quoting *Squyres v. Heico Cos., L.L.C.*, 782 F.3d 224, 236 (5th Cir. 2015).

Here, Loayza did not present Tupper's remarks as direct evidence of discrimination, but as ingredients in the overall evidentiary mix. As such, the district court erred in applying the four-part direct evidence test.

### b. Under The Correct Test, Tupper's Comments Show Pretext

When Loayza informed Tupper of her upcoming maternity leave, he expressed frustration with the anticipated timing and length of her absence, comparing it to the maternity leave of another employee at the store, which had been only four weeks. ROA.436-37; ROA.492. Further, Tupper threatened to discipline Loayza for having to leave work early because of pregnancy related sickness, even though she was permitted to take intermittent FMLA leave. ROA.439-41.

Using the incorrect test, the district court determined that "Plaintiff has presented no evidence to suggest that Tupper's alleged comment regarding the length of Plaintiff's maternity leave was related to the ultimate decision to terminate her." ROA.605. However, the correct test does not require this relation, and the fact that the comments were not explicitly tied to Tupper's termination decision is not dispositive.

Tupper's comments and frustration toward Loayza for the length and timing of her leave show discriminatory animus. *See Laxton*, 333 F.3d at 583 (holding that supervisor's remark expressing frustration over employee's pregnancy timing and impact on holiday staffing "permitted [the jury] to infer discriminatory animus");

27

*see also EEOC v. Ryan's Pointe Houston*, No. 19-20656, 2022 U.S. App. LEXIS 27079, \*19-20 (5th Cir. 2022) (decisionmaker's frustration that plaintiff intended to take full FMLA leave "supports the conclusion that [her] pregnancy played a role in her termination").  This inference is further strengthened by the fact that, shortly after making these comments, Tupper bypassed standard store policies and procedures to hire a permanent replacement for Loayza.  ROA.452-54.

As for the second part of the test, internal communications show that Tupper was in fact the decisionmaker, as he made the final call to terminate Loayza rather than provide a final warning.  ROA.550.  Even if Tupper was hypothetically not the decisionmaker, that call makes him "a person with influence or leverage over the relevant decisionmaker." *See Goudeau*, 793 F.3d at 476.  Because Tupper was the decisionmaker and made comments that permit a jury to find discriminatory animus, summary judgment was improper.

Further, the district court acknowledged that "a supervisor's threat of retaliation" is "some evidence of pretext."  ROA.605.  However, it discounted Tupper's threats to retaliate against Loayza because she did not provide "otherwise strong evidence of pretext." ROA.605.  Yet, beyond these discriminatory comments, Loayza provided evidence showing (1) she followed a supervisor's directive; (2) Tupper manipulated the disciplinary investigation; and (3) other employees, including Tupper himself, flouted the same policies proffered as the justification for

terminating Loayza.  *See supra* at Section I.(D)(1)(a); *infra* at Section I.(D)(3), Section I.(D)(5).

Moreover, unworthy of credence is WFM's argument that "[t]here is no evidence Tupper or any upper management at [WFM] knew about [Loayza]'s intention to organize a baby shower and thereby could have used this occasion as a pretext to terminate her."  ROA.124.  Tupper knew that he was terminating Loayza for the purchase of items for her baby shower because his termination paperwork states that she was purchasing "bakery items for her Baby Shower."  ROA.540.

This is strong evidence of pretext and, viewing these facts in the light most favorable to Loayza, could permit a rational juror to find in her favor.  As such, the district court erred in granting summary judgment.

### 3.  Tupper Manipulated the Investigation, Undermining its Integrity

After learning of Loayza's baked goods purchase for her baby shower, Tupper escalated the issue to HR, not as a neutral investigator, but with the goal of manufacturing a basis for her termination. This is evident by the fact that Tupper demanded she write a statement on the spot, which he then influenced and manipulated.  ROA.427-28; ROA.492.  Rather than allowing Loayza to document her own account, Tupper coerced her to alter her statement by inserting the word "retail" after "pay" to make it read: "I understand that we have a policy that we need to pay retail for everything."  ROA.427-28; ROA.492.  This statement did not reflect

Loayza's belief or understanding at the time of the purchase, and the inclusion of "retail" changed the meaning significantly, implying that Loayza understood she had violated policy when she did not.

I understand that we have a policy that we need to pay retail for everything that we get at the store. I always do that

ROA.536.

This type of manipulation, combined with the suspicious timing of Loayza's termination (only nine days before her maternity leave was set to begin) is significant evidence of pretext. *See Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 238-40 (5th Cir. 2015) (manufactured, misleading, and illegitimate evidence originating from the employer is "significant evidence of pretext"); *see also Shackleford v. Deloitte & Touche, LLP*, 190 F.3d 398, 409 (5th Cir. 1999) ("the combination of suspicious timing with other significant evidence of pretext, can be sufficient to survive summary judgment"). Because a reasonable juror could infer pretext based on these facts, summary judgment was improper.

### 4. No Explanation Given for Tupper's Decision to Terminate Loayza Instead of Issuing a Final Warning

Contemporaneous written documentation that fails to include any reasoning as to "why the particular disciplinary decisions were made" can be used to question the legitimacy of the employer's proffered justification. *See Turner v. Kan. City S.*

*Ry. Co.*, 675 F.3d 887, 903-04 (5th Cir. 2012) ("Although the discharge letters state that [the employees] were found to have violated certain workplace rules, they do not provide any reason for [the supervisor]'s decisions to dismiss these employees" and "they do not give any indication that they reflect [the supervisor]'s reason for choosing to dismiss the employees, as opposed to merely suspending them.").

Internal emails reveal that Tupper was explicitly granted discretion to issue a final warning in lieu of terminating Loayza.   ROA.550.   Yet there is no documentation, contemporaneous or otherwise, that explains why Tupper selected the most severe penalty available.   Further, even if progressive discipline was not mandatory, an employer's unexplained failure to follow it may still raise an inference of pretext.  *See Goudeau*, 793 F.3d at 477 ("[W]hen an employer opts to have a disciplinary system that involves warnings, failure to follow that system may give rise to inferences of pretext.").

As such, the absence of an explanation as to why Tupper opted to terminate Loayza, rather than follow WFM's disciplinary system that allowed for a final warning, allows for an inference of pretext.  Accordingly, the district court erred in granting summary judgment.

### 5.  Tupper and Others Regularly Engaged in the Same Conduct Without Discipline

Summary judgment should also be reversed because the record contains ample evidence of disparate treatment.  *Assariathu v. Lone Star Health Mgmt.*

31

*Assocs., L.P.*, 516 F. App'x 315, 320 (5th Cir. 2013) ("Pretext can be established by showing disparate treatment. . ."). Here, other employees, including Tupper himself, engaged in the same and more serious conduct than Loayza, without facing discipline.

Loayza was allegedly terminated based on her purchase of baked goods below retail price. ROA.540. However, both Loayza's testimony and Sellars's affidavit show that Tupper himself regularly flouted this policy and allowed other employees to do so. ROA.446-47; ROA.483. "His favorite team leads" were allowed to take merchandise and other property from the store, including a gas cooker, tables, and chairs—all without paying a cent, nonetheless retail price. ROA.480. Additionally, Tupper regularly expected and directed team leaders, including Loayza, to falsely scan food as spoiled inventory. ROA.448–49. Yet, no employee, other than Loayza, was ever disciplined for this regular practice. ROA.455-56. The Supreme Court has held that in establishing pretext in a pregnancy discrimination case, "a plaintiff may rebut an employer's proffered justifications by showing how a policy operates in practice." *Young v. United Parcel Service*, 575 U.S. 206, 230 (2015).

Even if there is a fact question as to whether these employees were similarly situated to Loayza, evidence of differential treatment can still be probative of pretext. *Brown*, 969 F.3d at 580 (5th Cir. 2020) (citing *Porter v. Houma Terrebonne Hous. Auth. Bd. of Comm'rs*, 810 F.3d 940, 950 (5th Cir. 2015) (considering evidence of

differential treatment received by four employees but noting that the plaintiff had "not demonstrated that those four employees were similarly situated").

As such, this pattern of selective enforcement, especially when directed by the very person who terminated Loayza, casts serious doubt on the legitimacy of WFM's stated reason and supports an inference of pretext, precluding summary judgment.

## II.     The District Court Flipped the Summary Judgment Standard and Resolved Factual Disputes in WFM's Favor

The district court failed to apply the proper summary judgment standard. Rather than crediting the evidence and inferences in Loayza's favor, the court repeatedly weighed contested evidence, adopted WFM's narrative, and disregarded sworn testimony favorable to Loayza. This error alone warrants reversal.

The Supreme Court has made clear that courts must not resolve factual disputes at the summary judgment stage. *Tolan v. Cotton*, 572 U.S. 650, 656 (2014). In *Tolan*, the Supreme Court determined that the appellate court "failed to view the evidence at summary judgment in the light most favorable to Tolan with respect to central facts of this case." *Id*. at 657. "In failing to credit evidence that contradicted some of its key factual conclusions, the court improperly 'weighed the evidence' and resolved disputed issues in favor of the moving party." *Id.* (quoting *Anderson*, 477 U.S. at 249). Such is the case here.

**1. The District Court Credited WFM's Evidence While Qualifying Loayza's Evidence as "Alleged"**

The district court did precisely what *Tolan* forbids.  In its order, the court repeatedly used the terms "alleges," "alleged," and "allegedly" only in reference to Loayza's evidence, while accepting WFM's version of the events without qualification.  Examples of this include (emphasis added):

- "Plaintiff also **alleges** that Tupper would give Whole Foods items to other employees for free."  ROA.597.

- "Plaintiff also **alleges** that, on one occasion, Tupper threatened to discipline her for leaving work early due to pregnancy related illness." ROA.598.

- "Plaintiff sent TMS a revised statement regarding the bakery purchase, **alleging** that Tupper attempted to dictate her initial statement and that her revised account was more accurate." ROA.599.

- "Plaintiff also **alleged** that Tupper was targeting her and treating her unfairly." ROA.599.

- Plaintiff **alleges** that she thought she followed proper procedure by getting approval from Sellars before purchasing the bakery items at a discounted price." ROA.604.

- "Next, Plaintiff argues that she can establish pretext based on Tupper's **alleged** unprofessional actions and discriminatory comments." ROA. 605.

- "And here, Plaintiff has presented no evidence to suggest that Tupper's **alleged** comment regarding the length of Plaintiff's maternity leave was related to the ultimate decision to terminate her." ROA.605.

- "And second, Tupper **allegedly** threatened disciplinary action when Plaintiff left work early due to pregnancy related illness." ROA.605.

In contrast, the court never used such qualifying language to describe WFM's assertions, even when they were explicitly disputed. For example, the order states as fact that "[a]t Plaintiff's direction, Bona rang up 211 bakery items using a $1.00 special decoration fee, which was below the actual cost price and the retail price of the items." ROA.598. But this assertion is disputed in a number of ways. First, Bona did not ring up 211 items; rather, he applied the $1.00 special decoration fee 211 times to reach a price of $211.00. ROA.420-21; ROA.522. Moreover, contemporaneous documentation and testimony show that Loayza asked to pay cost price and that Bona unilaterally determined the price she would pay:

- "I didn't give him the cost of the items, nor calculate anything myself, but requested he charge me the approved cost price amount by store leadership which he provided me." ROA.519.

- "I didn't determine the price. He told me the price." ROA.417.

- "I never mentioned, oh charge me this. I only told him give me the price and he printed and give [sic] it to me." ROA.423.

In fact, had Bona taken direction from Loayza, he himself would have been in violation of the Team Member Purchases policy, which states that members may not "price their own product." ROA.368. There is no evidence in the record that Bona was terminated for violation of this policy.

Rather than viewing this evidence in the light most favorable to Loayza, the court drew inferences in WFM's favor. This approach effectively flipped the

summary judgment standard, treating the movant's evidence as established and the non-movant's as speculative.  *See Campos*, 10 F.4th at 518 (explaining "we will view the events in this case through the non-movant employee's relevant evidence, even if disputed, and the employer's undisputed evidence.").  This warrants reversal of summary judgment.

### 2.  The District Court Resolved Factual Disputes in WFM's Favor

The district court additionally failed to properly apply the summary judgment standard when it resolved disputed issues of material fact in WFM's favor.  For example, the district court stated "there is no dispute that Plaintiff directed Bona to use a $1.00 special decoration fee when ringing up the bakery items."  ROA.604.  However, this is squarely in dispute.  *See* ROA.259 (listing this issue second in a list of "disputed material facts"); ROA.255 (contending Bona determined the pricing and Loayza did not direct Bona).  This factual finding was dispositive in the district court's opinion.  ROA.598; ROA.604.

In addition, the district court stated that "[t]here is also no dispute that Defendant conducted a complete investigation of Plaintiff's bakery purchase, which involved procuring written statements from Bona, a team member witness, and Plaintiff recalling their account of events."  ROA.604.  But this finding disregards evidence pointing in the opposite direction.  First, Loayza called into question the integrity of WFM's investigation by asserting that WFM, by its own admission,

never contacted or interviewed Sellars—despite receiving information that she approved the purchase and could corroborate Loayza's explanation. ROA.509-10; ROA.538. Second, Loayza's testimony and contemporaneous documentation show that Tupper tampered with the investigation by coercing Loayza to alter her statement. ROA.427-28; ROA.492.

Viewing these assertions in the light most favorable to Loayza, a jury could reasonably conclude that the investigation was both incomplete and suspicious. *See Owens v. Circassia Pharm., Inc.*, 33 F.4th 814, 828-29 (5th Cir. 2022) (noting an employer's investigatory choices might "be suspicious in a way that renders the defendant's explanation…unworthy of credence and permits an inference of discrimination.") (citing *Reeves*, 530 U.S. at 147).

By declaring the investigation "complete" despite evidence showing the opposite, the district court improperly resolved a factual dispute. That credibility determination belongs to a jury, not the court. *Anderson*, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge…").

Because the district court improperly weighed the evidence, credited only WFM's version of events, and resolved factual disputes in its favor, its decision cannot stand, and summary judgment should be reversed.

### III.    The District Court Failed to Apply the Mixed-Motive Framework

The district court further erred by failing to apply the mixed-motive framework to Loayza's claims.

A plaintiff relying on circumstantial evidence has two options to survive summary judgment, by showing either: "(1) that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another 'motivating factor' is the plaintiff's protected characteristic (mixed-motive[s] alternative)." *Black*, 646 F.3d at 259 (5th Cir. 2011) (quoting *Rachid*, 376 F.3d at 312). For a defendant to prevail on summary judgment under the mixed-motive framework, the defendant must show "that the same adverse employment decision would have been made regardless of discriminatory animus." *Rachid*, 376 F.3d at 312.

In her response to WFM's motion for summary judgment, Loayza argued both the pretext and mixed-motive theories of liability:

> There is sufficient evidence to demonstrate that this justification is pretextual and unworthy of credence. In addition, there is evidence that an impermissible consideration of Loayza's pregnancy and impending maternity leave subjected her to stricter scrutiny by Tupper and ultimately was a motivating factor in her termination. *See Smith v. Xerox Corp.*, 371 Fed. App'x. 514, 520 (5th Cir. 2010), ("An employer does not meet its burden of demonstrating its affirmative defense merely by showing that its employment decision would have been justified; instead, it must show that its legitimate reason alone would have resulted in the same decision.").

ROA.266.

However, the district court failed to conduct any analysis under the mixed-motive alternative. Even if the district court did not find pretext in WFM's proffered justification, it was still required to address whether Loayza's pregnancy was a motivating factor in her termination.

Under the mixed-motive framework, Loayza presented sufficient evidence to create a genuine issue of material fact precluding summary judgment. Even assuming the alleged policy violations constitute a legitimate motive, the record contains ample evidence from which a jury could find that Tupper impermissibly considered Loayza's pregnancy and related leave in the decision to terminate her. This includes evidence that Tupper (1) made negative comments and threatened to retaliate against Loayza for exercising pregnancy related leave, (2) shortly thereafter, circumvented store protocols to hire her permanent replacement, and (3) manipulated the internal investigation process. *See supra* at Section I.(D)(2)(b); Section I.(D)(3).

Further, WFM proffered no explanation, contemporaneous or otherwise, as to why Tupper declined to give Loayza a final warning, despite being given the discretion to do so. *See supra* at Section I.(D)(4). Viewing these facts in the light most favorable to Loayza, a reasonable juror could find that Tupper impermissibly

considered Loayza's pregnancy as a motivating factor in her termination. As such, summary judgment was improper and should be reversed.

## IV.   This Case Is Appropriate for Trial

The evidence in this case suggests that different folks can draw different conclusions as to why Loayza was terminated and whether WFM's justifications are a pretext. This underscores why summary judgment is improper—reasonable minds can differ. A summary judgment predicated on facts genuinely in dispute is improper. In weighing the evidence, the court necessarily substitutes its judgment of the evidence for that of the jury. *See Tolan*, 572 U.S. at 657 (2014) (holding that court displayed a "clear misapprehension of summary judgment standards" when it credited the version of events from the witness of the summary judgment movant, while failing to credit the plaintiff's own recollection of events).

Moreover, it is important to look at the facts in this case in their entirety when deciding on pretext. As this Court recently reasoned in an employment case, "[i]t is necessary for the facts allegedly supporting a claim to be evaluated in their entirety." *Dabassi*, 107 F.4th at 506 (5th Cir. 2024). Likewise, "[j]ust as '[a] play cannot be understood on the basis of some of its scenes but only on its entire performance, . . . similarly, a discrimination analysis must concentrate not on individual incidents, but on the overall scenario.'" *Donaldson v. CDB Inc.*, 335 Fed. Appx. 494, 503 (5th Cir. 2009) (citations omitted); s*ee also Starnes v. Wallace*, 849 F.3d 627, 635 (5th

Cir. 2017) (reversing summary judgment for the employer in an employment case and emphasizing the importance of looking at the "big picture" in analyzing whether there is sufficient evidence of pretext to find for the plaintiff).

The big picture demonstrates that a genuine issue of fact exists on whether WFM's stated reasons for Loayza's termination are pretextual.  WFM is not entitled to a judgment as a matter of law.

Sworn testimony in favor of Loayza should be credited.  This Court has held that where an employee's "statements are no more and no less self-serving" than those of the employer's, to "signal that an employee's account could never prevail over an employer's…would render an employee's protections against discrimination meaningless." *Heinsohn*, 832 at 245.

Finally, as the Supreme Court has long cautioned, summary judgment should be used sparingly in litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged decisionmakers, and hostile witnesses thicken the plot.  *See Poller v. Columbia Broadcasting Sys., Inc.*, 368 U.S. 464, 473 (1962) ("It is only when witnesses are present and subject to cross-examination that their credibility and the weight to be given their testimony can be appraised. Trial by affidavit is no substitute for trial by jury which so long has been the hallmark of even handed justice.").

## **CONCLUSION**

Loayza asks this Court to reverse the district court's grant of summary judgment against her.

Respectfully submitted,

/s/ Ahad Khan
Ahad Khan
Texas Bar No. 24092624
712 Main Street, Suite 900
Houston, TX 77002
713-401-3558 – Telephone
ak@ahadkhanlaw.com - Email

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true and correct copy of the foregoing document was filed with the United States Court of Appeals for the Fifth Circuit and served electronically via the ECF filing system upon counsel of record listed below on the 30th day of September 2025.

Kelley Edwards
Jay Zhang
Littler Mendelson, L.P.
1301 McKinney Street, Suite 1900
Houston, TX 77010

/s/ Ahad Khan
Ahad Khan
Counsel for Plaintiff-Appellant

## <u>CERTIFICATE OF COMPLIANCE</u>

1. This document complies with the type-volume limit of FED. R. APP. P. 32(a)(7)(B) because, excluding the parts of the document exempted by FED. R. APP. P. 32(f) and 5th CIR. R. 32.1 because this document contains 9,139 words.

2. This document complies with the typeface requirements of FED. R. APP. P. 32(a)(5), and 5th CIR. R. 32.1 and the type-style requirements of FED. R. APP. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Mac Version 16.93 with a 14-point font named Times New Roman.

/s/ Ahad Khan
Ahad Khan
Counsel for Plaintiff-Appellant